CALIFORNIA THOROUGHBRED BREEDERS ASSOCIATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
California Thoroughbred Breeders Ass'n v. Commissioner
Docket Nos. 9174-85, 12115-85
United States Tax Court
T.C. Memo 1989-342; 1989 Tax Ct. Memo LEXIS 341; 57 T.C.M. (CCH) 962; T.C.M. (RIA) 89342; July 18, 1989
Adam Y. Bennion and Patrick M. McAdam, for the petitioner. John O. Kent, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the taxable years 1978 through 1983 as follows: Year
Deficiency
1978
$ 166,764
1979
82,086
1980
104,054
1981
181,446
1982
362,873
1983
250,599
$ 1,147,822
After concessions by respondent, the issues for decision are: (1) whether petitioner's distributive share of the profits from its activities in connection with the sale of horses by a joint venture auction constituted taxable unrelated business income pursuant to section 511[1] and, if so, (2) whether petitioner is entitled to deduct additional exempt association expenses to offset its distributive share of profit from the joint venture. FINDINGS OF FACT
*344 The California Thoroughbred Breeders Association (CTBA or petitioner) was organized on May 8, 1937, as a nonprofit corporation under the "not for profit" provisions of the laws of the State of California (section 9000 et seq. of the California Corporation Code (West 1977)). Petitioner's principal office at all relevant times was located in Arcadia, California. Petitioner's returns (Forms 990) for the calendar years 1978 through 1983 were filed with the Internal Revenue Service in Fresno, California. Under its articles of incorporation, as amended in 1945 and in effect at all times thereafter, petitioner's purposes are -- To encourage, assist, regulate and protect the raising and breeding of Thoroughbred horses; to disseminate information to members of the corporation and to others who are breeders of Thoroughbred horses within the State of California, and to give support, financially and otherwise, to the development and general welfare of the breeding of Thoroughbred horses by breeders within the State of California, and to do any and all things connected therewith or incidental thereto. No part of the net earnings of the corporation shall inure to the benefit of any member *345 or individual and no substantial part of its activities shall be used to carry on propaganda or otherwise to attempt to influence legislation. Petitioner's bylaws limit membership to the owner or part owner of one or more thoroughbred brood mares maintained for breeding in California, whose foals would be eligible for registration in the "American Stud Book," or the owner or part owner of a thoroughbred stallion "standing" in the State of California for a fee. By letter dated November 1, 1945, the Internal Revenue Service reaffirmed an earlier ruling dated September 9, 1943, that petitioner is exempt from Federal income tax under section 101(1) of the Internal Revenue Code of 1939, which exempted "labor, agricultural, or horticultural organizations." This is the same provision as section 501(c)(5) of the present Internal Revenue Code. Respondent concedes that petitioner was a tax-exempt organization during the taxable years involved, but he determined in the statutory notices of deficiency that income derived by petitioner from a joint venture engaged in the conduct of auction sales of thoroughbred horses constituted unrelated business income subject to tax *346 under section 511 of the Internal Revenue Code. Horseracing was outlawed in California in 1909. In 1933, California legalized horseracing by enacting the Horse Racing Law (chapter 4 of the California Business and Professions Code). One of its declared purposes was "encouraging agriculture and the breeding of horses in this state" (section 19401(b) of the California Business and Professions Code). Section 19565 of the California Business and Professions Code provided that the Horse Racing Board "shall by rule provide for the registration of all California-bred horses." The California Horse Racing Board promulgated Rule No. 362 in 1943, which designated petitioner as the officially approved agency for the registry of all California-bred horses. This rule has been in effect since that time. Sections 19567 and 19568 of the California Business and Professions Code (West 1987) are as follows: Section 19567. California-bred horses; payments to breeders Since the purpose of this chapter is to encourage agriculture and the breeding of horses in this state, a sum equal to 10 percent of the first money of every purse won by a California-bred horse at a horserace *347 meeting shall be paid by the licensee conducting the meeting to the breeder of the animal. This section shall apply to any California-bred standardbred horse that is foaled on or after the first day of November 1977 for all races, except the California standardbred sires stakes races. Section 19568. California-bred race; substitute race Every licensee conducting a horse racing meeting shall each racing day provide for the running of at least one race limited to California-bred horses, to be known as the "California-bred race." If, however, sufficient competition cannot be had among horses of that class on any day, the race may, with the consent of the board, be eliminated for that day and a substitute race provided. Petitioner commenced its activities in 1937. Its membership gradually increased from 1,838 to 2,660 during the taxable years involved here. During those years, there were approximately 600 to 700 farms in California on which thoroughbred horses were being bred, scattered throughout the state from the Mexican border on the south, to the Oregon border on the north, and from the coast on the west to the eastern border of the state. Petitioner's activities are varied, *348 including foal registration, publication of a magazine, educational seminars, maintenance of a library, and a pedigree service bureau, as well as the sale of horses by auction. For example, petitioner's magazine, "The Thoroughbred of California," is a monthly publication with subscribers throughout the country and abroad. The magazine employs a staff of at least ten. The magazine contains information on such topics as veterinary medicine, horse husbandry, and other horse-related topics. The magazine has won several awards as the best horse publication in the country. Petitioner also has a pedigree service bureau which annually produces more than 2,000 catalog pages for their auction sales, as well as occasional catalogs for other sales companies outside the state. Additionally, the CTBA library contains over 12,000 volumes, including stud books and racing calendars from 14 countries and is possibly the largest horse library of its kind in the world. Petitioner began its efforts with respect to thoroughbred sales in connection with a "mixed" sale of brood stock in 1939. In 1953, petitioner approached Fasig-Tipton Company (Fasig-Tipton), with headquarters in New York, to conduct *349 thoroughbred auction sales in California under petitioner's sponsorship. Fasig-Tipton is one of the country's leading auction companies of thoroughbred racehorses and has served the thoroughbred industry for over 40 years. Fasig-Tipton is not a tax-exempt corporation. The arrangement between petitioner and Fasig-Tipton was evidenced by letter agreements, usually for a period of 2 to 3 years. The letter agreements remained substantially the same through the years. The letter agreements referred to were replaced in 1973 by a joint venture agreement dated January 9, 1973. The agreement by its terms was to continue until February 28, 1977. It was amended from time to time, solely to extend its terms for additional periods of time, and the agreement remained in effect during the 6 taxable years involved here. The joint venture, California Thoroughbred Breeders Association Sales (CTBA Sales), was run as a separate entity with all year-round expenses, including staff salaries, telephones, office rent, etc., being split equally, as were year-end profits. The CTBA Sales management committee consisted of six persons, the CTBA president, the CTBA general manager, chairman of the sales *350 committee of CTBA, the Fasig-Tipton president, the Fasig-Tipton treasurer, and the Fasig-Tipton of California sales manager. The joint venture agreement stated purposes are as follows: 2. Powers and Purposes of the Joint Venture. The joint venture is formed for the purposes of conducting thoroughbred horse auction sales in and throughout the State of California as auctioneer and taking whatever steps are necessary and proper to conduct said sales and collect the proceeds therefrom, including the purchasing or leasing office and sales space, borrowing money for the purposes of the joint venture, pledging, mortgaging or otherwise hypothecating the capital commitments of the parties hereto and all or any of the joint venture properties therefor, investing of funds and operating capital, selling, exchanging, or otherwise disposing of all or any part of the properties of the joint venture for cash or any other consideration as the parties may from time to time determine and employing such managers, employees and other agents as may be necessary to carry out the purposes of this joint venture. The terms of the agreement provided that the joint venture would enter into a 5-year *351 lease agreement with CTBA for the lease of CTBA's sales facilities located at Hollywood Park Race Track at an annual rate of at least $ 45,000 per year payable by the joint venture. The joint venture agreement provided that the net income and net losses from the auction sales of the thoroughbreds would be shared equally. The services rendered by petitioner in connection with the auction sales included the following activities: (1) determining what sales should be conducted; (2) determining the dates and places of the sales; (3) preparing and handling the physical facilities for the sales; (4) disseminating entry blanks for nomination of horses for each sale; (5) collecting and processing the entries; (6) verifying that each horse has a certificate of registration; (7) verifying that each horse has been tested for certain diseases and has been found free of such diseases; (8) verifying that each brood mare has been tested to determine whether or not she is pregnant; (9) preparing a vast amount of pedigree information for use in the catalogs; (10) preparing, printing, and distributing catalogs; (11) handling the receipt and disbursement of funds from the sale of horses; (12) taking *352 care of the issuance and registration of papers with respect to horses sold; (13) resolving disputes between consignors and buyers; and (14) making and enforcing the conditions of the sales, an important aspect of preserving integrity. During the years 1978 through 1983, only one or two other auction houses were conducting auctions for the sale of California thoroughbreds. In the taxable years at issue when the joint venture conducted annual sales of thoroughbreds, petitioner's net income from such sales was as follows: July
March
Horses
2-Year
Of
Del Mar
Fall
Winter
Olds In
Racing
Summer
Breeding
Year
Mixed
Training
Age
Yearling
Stock
1978
43,034
92,096
( 1,942)
14,518 19,154 1979
3,774
70,266
2,609 ( 1,093)
1,424 1980
15,166
109,185
1,768 (31,586)
(26,128)
1981
46,776
133,067
13,603 ( 5,647)
( 3,316)
1982
134,249
366,151
(11,866)
19,294 16,008 1983
45,466
238,818
6,699 ( 5,798)
31,563 288,465
1,009,583
10,871 (10,312)
38,705 In addition to the above, sales of racing-age horses were held at Del Mar in 1978 and 1979 with petitioner's losses being *353 $ 3,322 and $ 12,780, respectively, a fall yearling sale in 1979 with petitioner's loss being $ 23,265, and dispersal sales in 1979 and 1983 with petitioner's net income being $ 6,182 and $ 11,189, respectively. As the chart indicates, CTBA Sales auctions were generally geared toward specific categories of horses for sale. However, non-California-bred horses were sold occasionally at auctions in California. For example, at the winter mixed sale held on January 29 and 30, 1979, the joint venture sold 40 non-California bred but "in-bred" mares from the Braugh Ranches of Riviera, Texas. The Braugh dispersal was the result of a divorce. In addition, non-CTBA members from California and out of state attended the auctions. A summary of the joint venture's total income, total deductions, and ordinary income for each of the taxable years is set forth as follows: Taxable
Total
Total
Ordinary
Year
Income
Deductions
Income
1978
$ 1,679,279
$ 1,059,701
$  619,578 1979
1,546,462
1,120,489
425,973 1980
1,679,912
1,182,167
497,745 1981
2,260,284
1,492,639
767,645 1982
3,270,462
1,653,887
1,616,575
1983
2,947,670
1,806,479
1,141,191
*354 The Form K-1 attached to the partnership returns indicates that petitioner's 50-percent share of the profits of the joint venture was as follows: Year
Amount
1978
$ 309,789
1979
212,986
1980
248,872
1981
383,822
1982
808,287
1983
570,596
The gross income of the joint venture basically consisted of entry fees, 5-percent commission on sales, and nomination fees. The agreement did not specify which expense would be charged against the gross income of the joint venture and, in fact, the parties were never in agreement as to what items would be allowed as charges against the joint venture income. In this connection, the agreement cited that the parties "desire to form and confirm the existence of a joint venture." In each year, petitioner incurred expense directly connected with the sales which were not charged through the joint venture but which were deducted on petitioner's returns from its one-half share of the reported partnership net income. The amounts of such expenses, including allocations of general and administrative expenses, for the years preceding the years involved in this case were as follows: Year
Amount
1966
$  49,887
1967
52,753
1968
52,152
1969
50,344
1970
49,926
1971
58,327
1972
84,796
1973
91,552
1974
89,232
1975
90,230
1976
103,728
1977
110,648
*355 The amounts of such expenses, including allocations of general and administrative expenses, for the taxable years involved in this case were as follows: Year
Amount
1978
$ 145,150
1979
165,807
1980
180,468
1981
200,904
1982
289,786
1983
242,737
In 1984, petitioner formed a wholly owned corporation known as California Thoroughbred Sales, Inc. (CTS) to continue the auction sales activities previously conducted by the joint venture, CTBA Sales. Petitioner formed this corporation because petitioner recognized it had come to a "crossroads" with Fasig-Tipton and decided this was the best alternative for the organization. CTS is a taxable corporation under subchapter C of the Internal Revenue Code. OPINION Section 501(c)(5) provides for the exemption of labor, agricultural, or horticultural organizations. Section 1.501(c)(5)-1(a), Income Tax Regs., provides that the agricultural organizations entitled to exemption under section 501(c)(5) are those which (1) have no net earnings inuring to the benefit of any member and (2) have as their objects the betterment of the conditions of those engaged in agricultural pursuits, the improvement of the grade of *356 their products, and the development of a higher degree of efficiency in their agricultural occupations. Section 511 imposes a tax "on the unrelated business taxable income" of the tax-exempt organizations described in section 501(c)(5). Section 512 defines "unrelated business taxable income" as "the gross income derived by any organization from any 'unrelated trade or business' (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business * * *." Section 513 defines an "unrelated trade or business" as "any trade or business, the conduct of which is not substantially related * * * to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * *." Section 513(c) of the Code provides that the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. Thus, while petitioner is exempt from taxation under section 501(c)(5) as an agricultural organization, the profits it *357 earns from the sale of horses by auction may be subject to tax if the auction profits are unrelated business taxable income (UBTI). The regulations have delineated three elements necessary for income from an activity to be UBTI: (1) the activity from which the income is derived is a trade or business, (2) the trade or business is regularly carried on by the organization, and (3) the conduct of the trade or business is not substantially related (other than through the need for or use of the funds produced) to the organization's tax-exempt purpose. Section 1.513-1(a), Income Tax Regs.; United States v. American Bar Endowment, 477 U.S. 105, 110 (1986); United States v. American College of Physicians, 475 U.S. 834, 838-839 (1986); National Waterwell Association, Inc. v. Commissioner, 92 T.C. 75 (1989); West Virginia Medical Association v. Commissioner, 91 T.C. 651 (1988). UBTI exists only if all three elements are found. Veterans of Foreign Wars, Mich. v. Commissioner, 89 T.C. 7, 19-20 (1987). In this case, there appears to be no dispute that the horse auctions were a trade or business and were regularly *358 carried on. Thus, the focus of our discussion on this issue is limited to whether or not petitioner's business was substantially related to its tax-exempt purpose as an agricultural organization under section 501(c)(5). Petitioner has the burden of proof, Rule 142(a), and avoids the tax entirely if it can show that its auction activities were substantially related to its exempt purpose. For a substantial relationship to exist, the activity that produces the income "must contribute importantly to the accomplishment of those [exempt purposes]." Section 1.513-1(d)(2), Income Tax Regs. The regulations describe the type of relationship that qualifies as substantial -- Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, *359 the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. * * * [Section 1.513-1(d)(2), Income Tax Regs.] Section 1.513-1(d)(2), Income Tax Regs., continues that this analysis "depends in each case upon the facts and circumstances involved." (Emphasis added.) An organization, however, cannot use its need for funds or the use it makes of these funds for an organization's exempt purpose to establish that the activity is substantially related to the accomplishment of the organization's exempt purpose. Section 1.513-1(d), Income Tax Regs.; Carolinas Farm & Power Equipment Dealers v. United States, 699 F.2d 167 (4th Cir. 1983); Disabled American Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178 (1981). Respondent relies on section 1.513-1(d)(2), Income Tax Regs., in asserting that the auction sales bear no causal relationship to the advancement of petitioner's exempt purposes. Petitioner was organized for educational, charitable, and scientific purposes specifically related to the "raising and breeding" *360 of thoroughbred horses within the State of California. Respondent questions whether the active creation of a marketplace for the sale of both California and non-California bred horses has anything to do with these purposes or with regard to the breeding or raising of California thoroughbred horses. At best, he concludes, it is merely incidental. Moreover, respondent argues that the sales activities were conducted primarily as a commercial business and to promote its own commercial interests, not its exempt purposes. Petitioner argues to the contrary. Petitioner's purposes are basically to incur, assist, and regulate the raising and breeding of thoroughbred horses, to disseminate information to petitioner's members and to others who are breeders of thoroughbred horses in California, and to give support financially and otherwise to the development and general welfare of thoroughbred horses by breeders in California. These purposes, petitioner contends, are substantially related to the declared purpose of the California Horse Racing Law, namely encouraging agricultural and the breeding of horses in California. In this regard, petitioner's sales activity, along with its other services, *361 is in keeping with the requirement for exemptions set forth in section 1.501(c)(5)-1(a)(2), Income Tax Regs., namely, "the betterment of the conditions of those engaged in such pursuits, the improvement of the grade of their products, and the development of a higher degree of efficiency in their respective occupations." Petitioner highlights that many, if not most, of its activities support these objectives and upgrade the industry of thoroughbred horse breeding in California. The auctions are no exception and are vital to carrying out petitioner's exempt purpose. The service performed by petitioner in helping to provide a marketplace that has continuity and integrity contributes importantly to its exempt function. Several cases have reviewed this precise issue, with varied results and formulas. The Supreme Court, in United States v. American College of Physicians, 475 U.S. at 834, focused on the question of how a section 501(c)(3) [2] organization operated or conducted the activity to determine whether a substantial relationship existed. 475 U.S. at 848. As there are no Supreme Court cases which specifically review a section 501(c)(5) agricultural *362 organization on this issue, we begin our analysis here. In American College of Physicians, the Supreme Court held that the business of selling advertising space in the taxpayer's medical journal was not substantially related to the organization's tax-exempt purpose. Although the taxpayer argued that the advertisement served to educate the organization's members about recent medical developments, which was one of its tax-exempt purposes, the Supreme Court held that it would examine the conduct and intent of the organization rather than the educational impact of the advertisements on the organization's members. 475 U.S. at 848. The Supreme Court found that the taxpayer did not use or intend to use the advertising for the purpose of contributing to the educational value of the journal since only those willing to pay received space in the journals, and the advertisements were often repeated month to month totally unrelated to the articles in the journal or sometimes unrelated to the purposes of the organization. 475 U.S. at 849. Thus, the Supreme Court found that any educational function that the advertisements might serve was only incidental to its *363 purpose of raising revenue. 475 U.S. at 849. In deciding this issue, the Court rejected the government's argument that advertising published by tax-exempt professional journals can never be substantially related to the purposes of the journals and is therefore always a taxable business. The Court, thus, rejected a "per se" rule of taxation and commented that "the regulations specifically condition tax exemption of business income upon the importance of the business activity's contribution to the particular exempt purpose at issue" which requires a "facts and circumstances" analysis under section 1.513-1(d)(2), Income Tax Regs. 475U.S. at 842-843. In addition to the Supreme Court decision, several other cases have looked to whether the activity at issue benefits the common business interest of a membership or industry as a whole and not just individual persons in their individual capacities. Professional Ins. Agents of Michigan v. Commissioner, 726 F.2d 1097, 1103 (6th Cir. 1984), *364 affg. 78 T.C. 246 (1982); Carolinas Farm & Power Equipment Dealers v. United States, 699 F.2d at 171; Louisiana Credit Union League v. United States, 693 F.2d 525, 535 (5th Cir. 1982). Alternatively, an activity is considered tax exempt when it does not assure each member that he will receive benefits that are directly proportional to the fees he pays, such as lobbying services or educational seminars. Professional Ins. Agents of Michigan v. Commissioner, 726 F.2d at 1104; Steamship Trade Assn. of Baltimore, Inc. v. Commissioner, 757 F.2d 1494, 1498 (4th Cir. 1985), affg. 81 T.C. 303 (1983). While the cases just cited deal with business leagues under section 501(c)(6) which are operated to promote the business interests of persons having such common interests, we view the analysis as relevant for our discussion of section 501(c)(5) as well because section 501(c)(5) provides that agricultural groups be operated in such a way that promotes the betterment of the conditions of those engaged in such projects and the improvement of their products. The Supreme Court's opinion in United States v. American College of Physicians, 475 U.S. at 834, *365 with the emphasis on how the organization conducts the activity, does not change this test and is entirely consistent with it. See National Waterwell Association, Inc. v. Commissioner,92 T.C. at 75. Yet a third line of cases have looked into whether the particular service provided by the exempt organization is available elsewhere through other commercial enterprise. For example, in Oklahoma Cattlemen's Association, Inc. v. United States,310 F. Supp. 320 (W.D. Okla. 1969), a group insurance program offered by a section 501(c)(5) organization was found to be substantially related to the purposes of the tax-exempt state cattlemen's association. Because the membership of the association consisted exclusively of self-employed persons who had no opportunity to participate in group insurance programs other than the program made available by the cattlemen's association, the service of making available the group insurance to its members was related to its exempt purposes. See also Orange County Builders Association, Inc. v. United States, an unreported case (C.D. Cal. 1965), 16 AFTR 2d 5570, 65-2 USTC par. 9679. (Organization's mere *366 sponsorship of home trade show was found to be substantially related to the conduct of its exempt purpose of improving conditions in the building construction industry.) In Hi-Plains Hospital v. United States,670 F.2d 528 (5th Cir. 1982), the court found that pharmaceutical sales by a hospital pharmacy to nonhospital private patients of doctors located in a hospital were not subject to tax as being income generated by an unrelated trade or business conducted by a charitable organization because the sales contributed importantly to attracting and holding doctors in the community which had lacked any medical services for 8 years before the hospital was established. This was determined to be essential to the tax-exempt purpose of providing the hospital. Also, there was no indication that sales were conducted on a larger scale than reasonably necessary. However, the sale of drugs to the general public who were not private patients of staff doctors or hospital patients was unrelated taxable business income. Where no substantial relationship exists between the taxpayer's exempt purpose and its profit-making activities, UBTI exists. For example, in Veterans of Foreign Wars, Mich. v. Commissioner,89 T.C. 7 (1987), *367 the taxpayer, a section 501(c)(4) and 501(c)(19) organization, argued that its annual Christmas card program, which consisted of contracting with a third party to have cards sent to each of petitioner's members, accompanied by materials soliciting funds for the organization, was substantially related to its exempt purpose because it enhanced the good feelings of members and promoted comradeship. We did not find this to be the case; rather, the predominant intent of the taxpayer was to produce income, and the card program did not contribute importantly to the organization's exempt purpose. 89 T.C. at 38. See Shiloh Youth Revival Centers v. Commissioner,88 T.C. 565 (1987) and St. Joseph Farms of Indiana v. Commissioner,85 T.C. 9 (1985). However, in Orton Ceramic Foundation v. Commissioner,56 T.C. 147 (1971), we found that, where in accordance with the terms of the testator's will, the trustee of the foundation the testator created took over and operated the testator's pyrometric cone manufacturing business and applied the profits to research in that area, that the profits therefrom were not UBTI. We noted that "The *368 intention was not that the manufacturer of pyrometric cones * * * be merely a source of income but rather it would serve as the necessary predicate to furthering the foundation's scientific and educational purposes." 56 T.C. at 163-164. Moreover, we noted the overall contribution to the ceramic industry. As is indicative by these two cases, each set of facts and circumstances must be closely scrutinized. The pertinent regulations also provide some guidance on this issue. The regulations look to (1) the relationship between the business activity and the accomplishment of the exempt purpose and (2) whether the activity is conducted on a larger scale than is necessary to accomplish the exempt purpose it purports to serve. See sec. 1.513-1(d)(1), Income Tax Regs. See also sec. 1.513-2(a)(4), Income Tax Regs.; H. Rept. No. 2319, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380; S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483. The objective of the unrelated business taxation laws was to stop perceived abuses of the tax laws by tax-exempt organizations that engaged in profit-making activities often to the disadvantage of those corporations *369 whose profits were purely taxable. See H. Rept. No. 2319, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380. See United States v. American College of Physicians,475 U.S. at 838. Thus, only where the evidence indicates a substantial relationship between the profit activity and the exempt purpose are the profits exempt from tax. [3] With this background, we review the evidence before us and, based on such evidence, agree with petitioner that the auction activities were substantially related to the exempt purposes of petitioner. *370 Much of the testimony at trial supported this view. Petitioner's expert witness, Dr. James J. Ahern, Jr., highlighted the positive benefits the auctions provided for the members in furtherance of its exempt purpose. Dr. Ahern has a bachelor of science, masters of science, and doctor of philosophy, all with an emphasis in agricultural economics. From August 1986 to the time of trial, he was an associate professor in the Agricultural Management Department of California Polytechnic State University in San Luis Obispo, California, with an emphasis in research and consulting in thoroughbred racing and breeding as well as fruits, vegetables, and agricultural flood basin evaluations. Dr. Ahern listed at least four areas where the auctions serve to assist in the development and production of thoroughbred horses in California. First, the sales are crucial to prevent a narrowing of the genetic pool through inbreeding. Because of the auction, breeders are able to select animals with proper characteristics to improve their breeds. Second, an auction provides educational benefits. One such benefit is the animal science program at Cal Poly (San Luis Obispo). Since the 1950's, Cal Poly students *371 under faculty supervision have raised and prepared first, yearlings for the Del Mar sales in other yearling auctions and lately, since the 1970's, have primarily sold school-raised animals and others at the 2-year-olds-in-training March sales. Many of the students have subsequently through sale contacts continued to work in the industry in both temporary and permanent positions. Such experience is crucial as they provide a sense of the market and how the industry assigns value to animals in the general functioning of the market. In addition, petitioner printed an extra number of catalogs because the catalogs were an important source of pedigree information, even for breeders or horse enthusiasts who did not attend the actual sale. Third, CTBA Sales auctions provided a necessary service to its members as there were few, if any, reputable auction houses which were conducting such sales during the relevant years. Dr. Ahern's report highlighted that "prior to the * * * [CTBA Sales] existence there were no regular recurring sales in California and even thirty years - forty years later, CTBA remains the only continuous presence in the California Thoroughbred market." Fourth, Dr. *372 Ahern contrasted petitioner's sales with those of commercial auction company sales -- In summary the CTBA has not acted like a profit maximizer, commercial auction company. While CTBA operates in a market with an extremely large share it seldom, if ever, has used the single seller position to its advantage. As a breeder organization CTBA has provided information on the market place to potential competitors. * * * * * * There are few, if any, barriers-to-entry in the Thoroughbred auction market and several commercial firms have come on the scene but few stay, the underlying cause for exit is usually less than adequate returns to capital or resources. In the 25 years since 1962 there have been two periods when the only sales offered have been CTBA events * * *. To enter the auction market a firm need only retain the services of a licensed auctioneer, rent a facility with stabling (adjacent or nearly), and rent a hall or set up a tent capable of seating a few hundred people. Over the years many sales have been conducted in the open air of race track grandstands, receiving barns, and walking rings. While not the most conducive to horse sales it is the right location (where *373 horsepeople are or will likely congregate) and requires minimal investment. The evidence indicates that petitioner regularly conducted sales irrespective of whether the sales made money or not and encouraged and accommodated all entries with a complete schedule of sales irrespective of whether the sales were profitable. Respondent's argument that Dr. Ahern's testimony is not credible because he characterized petitioner's activity as those of a trade association governed by section 501(c)(6), rather than an agricultural association governed by 501(c)(5), is not very persuasive. Dr. Ahern is an expert in the area of agricultural activities and his misinterpretation of the proper tax-exempt status of petitioner in no way diminishes his relevant testimony on the subject of the auctions' importance in helping to carry out petitioner's exempt purpose. Most of the testimony of the members at trial also supported this view. Marvin Roberts, who has been one of petitioner's members since the mid-1950's and a member of its board of directors since 1982, was asked, "How does one go about accomplishing these purposes: The betterment of the condition of breeders, and the improvement *374 of the grade of the products, the horses?" After mentioning such things as helping with legislation and the rules and regulations of the industry, service in connection with veterinary medicine, and education, Mr. Roberts testified as follows: The most important thing that the CTBA has, in fact, done for me, one individual in this industry, is to provide a sales outlet for my product that is dependable, that has integrity, that optimizes the value of my product in * * * an acceptable fashion. It is critical that in any state in the United States, or any country in the world, if they're going to produce thoroughbred horses, they must have a sales outlet for their product. Without it, you're an entity unto yourself and * * * in today's time, you try, especially like in the State of California, where * * * our geographic spread is so great, when you try to conduct private sales on a farm of some sort, it is very difficult to gather together sufficient possible or potential buyers for those horses that private treaty sales are virtually impossible. So, I have relied on the CTBA to become that solid rock outlet for the sale of my product. We have, for many years had private enterprise *375 type sales companies come along and their integrity many times been proven to be questionable and * * * you wouldn't get paid for your horse when you took it to the sale, or the buyer of that horse wouldn't get his papers * * * or that particular company would only be in business for two or three years and then they're gone, and you have maybe * * * [$ 6,000,000.00] or $ 7,000,000.00 invested * * * in an attempt to market your product, and suddenly you find * * * that private enterprise has filed * * * something and gone out of business and is no longer there. I see it in other states often, the CTBA has been a consistent and dependable and a sales outlet with integrity for all the time that I have been involved in the thoroughbred industry. He also testified as follows, in response to the question of how sales contribute to improving the quality of thoroughbred horses: A The * * * auction sales in any state contribute to upgrading a particular area, in this case California, in many ways, but one of those ways is that a sale becomes like * * * a horse competition and if I'm off on the farm trying to sell my horses as an individual to an individual buyer, I don't have that same *376 competitive comparison, let's say, that you do when all of the breeders gather together and put their horses in one area. And if I can convince lay people to buy my horses, even if they're second sort of quality, that's fine, but the buyer has become sophisticated enough to know that he's much better off to go to an area where they gather together several hundred horses and they can be compared, one with the other, and when you go there and you have thought all -- let's say all winter and spring, "Gosh. I've got a nice set of babies here, and I'm going to this yearling sale in great shape and I'm * * * going to do very well," and suddenly you get there and you realize that a lot of people have done very well and maybe you don't have as good a set of yearlings as you thought you had * * * and the sale, itself, reflects that in that you don't get as much money as the people that have done a better job, and it immediately teaches you, "I've got to go get better mares, I've got to breed to better stallions, I've got to upgrade if I'm going to stay with this program." In addition to that, sales help to increase the quality of the thoroughbred horse in California by virtue of the fact *377 that many of our members, myself included, will reach out to other parts of the world to buy the better pedigree, which is more sought after, and bring it for marketing here in California and thereby provide the California buyer with an upgraded pedigree, and an outcross -- genetic outcross pedigree which definitely improves the breed in California. Mr. Roberts owns a farm consisting of 200 acres plus from 30 to 80 additional acres of leased land. At the present time he has approximately 75 brood mares but during the breeding season, starting in February, he will breed approximately 350 brood mares. In 1983, he estimated that he bred approximately 200 mares. James R. Buell, a doctor of veterinary medicine and a thoroughbred breeder on a large scale in Buellton, California, who has been a member of petitioner since February 1962 and a member of its board of directors since 1969, testified that his answers to the same questions posed to Mr. Roberts would be "very similar" and "so, buying and selling * * * your breeding stock is certainly * * * the way at [sic] which you aspire to improve the quality of your product." Dr. Buell, in addition to being a veterinarian, owns a farm *378 in Buellton, California which is 3-1/2 miles due west of Solvang. He owns 200 brood mares of his own and also breeds mares that are year-round boarders on his farm, averaging approximately 50. He frequently goes to Kentucky, which is the leading thoroughbred breeding area of the world, to buy horses and bring them to California to produce horses and sell them within the State of California. Dr. Buell was chairman of petitioner's sales committee in the late 1970's and early 1980's, and he had many discussions with the general manager of Fasig-Tipton about the philosophy of sales and where and how to hold them. Petitioner's objective was to serve the thoroughbred breeders, whereas Fasig-Tipton wanted to make the highest profit. Dr. Buell testified that their position "was that during the 50's there was absolutely no profit in the sales and during the 60's * * * it was still * * * [shaky], but there was a little * * * [profit], and then we got into a big bull market in the horse business * * *." Dr. Buell continued "quite frankly * * * [Fasig-Tipton] thought it was a waste of time to conduct sales to sell a lot of cheap horses; but we made them persist in it, and * * * we *379 have a great record of continuity. These sales that we conduct have been held annually for 20 years, most of them." Dr. Buell further testified as follows: Q Is that continuity important to you as a breeder? A Absolutely. You have to plan your marketing program as these animals mature; and if you weren't assured, even when you're planning your breedings, your volume of production and everything else. You might have facilities to handle so many horses till they're weaned, and then you want to get rid of 20 percent, and then you'll have facilities to handle the balance until the yearling year, and you have to get rid of a certain percentage, and the rest * * * go into training at two, and you clear your paddocks, and the next crop comes in. You have to have an orderly marketing program. The following colloquy occurred during respondent's cross-examination of Dr. Buell: Q Now, these conversations with respect to expenses, those conversations were held, were they not * * * to control the expenses, so as to maximize your profit; is that not true? A That's not true. * * * we would look at it, as I have alluded to in my earlier testimony, our partners wanted to maximize *380 profit. They flew in here, set up camp a couple of days before the sale * * * [lent] us an invaluable aide, because they had the experts to actually conduct the sale, the auctioneering, the bid spotting that * * * a lot happens very quickly in an auction sale. We were the side of the coin whose responsibility it was to market horses and provide a marketplace within the State of California, and, as I have already testified, Fasig-Tipton did not like selling a lot of inexpensive horses, so we constantly sparred back and forth. Finally, Dr. Buell testified as follows: My discussions with Mr. Finney were that, "Look! Profit is not our bottom line. We've got to have a continuity of sales. We've got to have a sale with some integrity; and we owe it to our membership to have it because we're the only game in town that's willing to put up with this nonsense and -- of not making a lot of money and providing a full service series of sales." The next witness, Elwood Johnston, is the owner of a full-service breeding facility in Ontario, California, which is approximately 45 miles east of Los Angeles. He has been in the business since 1957 and his father was in the business prior thereto *381 since 1939. As to the meaning of a "full-service" facility, Mr. Johnston testified "we stand stallions, we board mares, we raise thoroughbreds for * * * [ourselves] and for clients. We have a training facility. We basically do all of the facets of the business." The farm will produce approximately 140 foals a year from 140 mares, of which approximately 75 mares are owned by Mr. Johnston. Mr. Johnston testified as follows: A Well, I am in the business to sell horses, that's why I am in the business. I own mares and own shares in stallions and own stallions outright for the purpose of producing a product that I can sell * * * and I sell most of all * * * the individuals that we produce, with the exception of a few fillies that may wind back up into our brood mare band. Mr. Johnston stated that he had heard the testimony of Mr. Roberts and Dr. Buell and that his testimony would be substantially the same if the same questions were posed to him. Mr. Johnston has been a member of petitioner since 1958, a member of its board of directors since 1970, and president of the organization from 1982 to 1984. He has been the leading breeder in California 13 separate years. The definition *382 of a leading breeder is the breeder whose foals out of the mares the breeder owns wins the most money in racing. He was also the leading breeder in the United States in 1971 and 1972. The next witness was Brian Sweeney, who was petitioner's general manager from 1968 until 1982. He has been involved with various aspects of the horseracing industry and the thoroughbred breeding industry commencing as a boy of 16 years of age in Ireland and later in Canada. His testimony included the following: Q You mentioned auction sales. What connection do auction sales have with the accomplishment of the Petitioner's purposes? A Well, every industry needs a marketplace, especially one where you have product or produce animals for sale, and you have to have somewhere to take your horses. There are lots of places to sell horses. You can sell horses in Kentucky. You can sell them in Arizona; but, obviously, for practical purposes, somebody who keeps and maintains their operation in California * * * would prefer to be able to sell their horses within the state, so they're not forced to take the risk of shipping, or the cost of shipping * * * and somebody needs to do it for the breeders in *383 the state; and the CTBA is, I guess one of their principal activities has been operating the sales or starting them, operating them, and upgrading them; and creating a marketplace that isn't just local, but national, and international. * * * We have, in recent years, because of changes in legislation, because of the growth of racing in California, it is now the major racing center in North America * * * the Los Angeles area, that we've been able to keep a lot of top horses. In particular, the horse that won the $ 3,000,000 Breeder's Cup Race last year, Skywalker was retired * * * [to] stud this year in California. We had Desert Wine, Flying Paster (ph), Bold Tropical (ph), horses of national prominence who might ordinarily have been exploited or bought out of the state, have been kept in the state. It's a slow process. It's a building-up process. It will take years before their progeny comes to prove how good they are * * * we're making some headway * * * in that regard. Mr. Sweeney gave an interesting summary of services performed by petitioner in keeping the dispersal sale of Fletcher Jones in California. Fletcher Jones was one of the most progressive thoroughbred *384 breeders in California with a magnificent farm in the Santa Ynez Valley called the "Westerly Stud Farm." He had invested the money to build one of the finest thoroughbred herds in California, consisting of mares as well as stallions. Unfortunately, he was killed in an airplane crash in 1972. The Keeneland in Kentucky was attempting to convince the executor, which was the Bank of America, to conduct the dispersal sale in Kentucky. Mr. Sweeney believed that this would be a major disaster for the thoroughbred industry in California, and he was able to convince the executor to conduct the dispersal sale at the new sales pavilion which petitioner had completed at Hollywood Park. Petitioner chartered a plane and flew buyers directly from Florida to the sale and Mr. Sweeney went to Japan to promote the sale. There were about 16 Japanese breeders in attendance at the sale. As a consequence of holding the sale in California, about 50 percent of the horses were bought by California breeders and remained in the State of California, and buyers from other states and countries were exposed to the caliber of horses that could be produced in California. Petitioner encouraged out-of-state buyers *385 to acquire California thoroughbreds and to take them elsewhere to give people an introduction to the California thoroughbred and also brought out-of-state horses to California in an effort to diversify the bloodlines available in California. On redirect examination, Mr. Sweeney concluded his testimony with the following: Q Mr. Sweeney, in connection with your last answer, if you incurred out-of-state or out-of-country, people who come here and buy horses, would you not run the risk that those horses would leave California? A Well, of course you run the risk of, in fact, that's what you're trying to encourage them to do, but primarily, you're trying to get people to come and buy California bred or California produced horses in the hope that those horses will be taken elsewhere, and give people a good impression of what can be produced in California. If we sold all of our best horses to Californians and they never left the State of California, we would never get international credit or national credit for what our horses were capable of doing. Now, I mean, a California owner may on occasion send his horses East, but an Eastern owner just keeps them in the East and if you have *386 a good California bred, that's the best advertisement you have for your industry, if he's racing elsewhere and doing well. The next witness was Kenneth Schiffer, who owns a farm in Temecula, which is located about 90 miles southeast of Los Angeles and about 60 miles north of San Diego. He breeds exclusively to race the offspring, rather than to sell them. He owns about 35 horses in all -- brood mares, yearlings, racehorses, and weanlings. He has been a member of petitioner since 1957, a member of its board of directors since 1972, and president from 1978 until 1983. He testified that he had heard the testimony of Mr. Roberts, Dr. Buell, and Mr. Johnston and if asked the same questions, his answers would for the most part be substantially the same. The final witness on this phase of the case was Louis Rowan, who has been involved in the thoroughbred breeding industry since before World War II. He testified as to the reasons for California outlawing horseracing in 1909 and of the efforts to bring back the breeding industry following enactment of the new horseracing law in 1933. With respect to the breeding industry as it existed in 1937, Mr. Rowan testified as follows: *387 Q In 1937, there were * * * very few breeders and * * * many of them were hurting. They had limited opportunities to raise and the purses were small and it was hard to get adequate breeding to their mares if they had good ones * * * and it was expensive and dangerous to ship mares to Kentucky, so the breeding industry was on hold. It was on a very tenuous basis and then maybe got started and then was again interrupted during World War II, when racing was suspended in California. Regarding the origin of petitioner's association with Fasig-Tipton, Mr. Rowan testified as follows: Q When you were President, did you participate in the negotiations with Fasig-Tipton? To conduct sales under the sponsorship by CTBA? A Yes. I did. Q How did that come about, do you recall? A I was a friend of Humphrey Finney, who was a very well known horseman at that time and he was President of Fasig-Tipton and he was a very upright and effective person and I felt and so did our Board at that time, that * * * a fair arrangement whereby Fasig-Tipton would come out here and auction our horses, our horses being those offered by the CTBA, would be to the overall benefit of the industry because as *388 I think you heard earlier, the sales companies that were here and operating at that time left quite a bit to be desired. So we did talk to Humphrey Finney, several of us, and he came out and we made * * * a rather loosely worded agreement with Fasig-Tipton Company. Finally, Mr. Rowan testified that he had heard the testimony of Mr. Roberts as to the contribution of the sales activities by petitioner to the accomplishment of its exempt purposes and if asked the same questions, his testimony would generally be the same. Respondent argues, nevertheless, that petitioner's auction sales did not better the overall conditions of California breeders or develop a higher degree of efficiency and improve the grade of California thoroughbred racehorses. The evidence, he suggests, shows precisely the contrary. First, respondent contends that it was petitioner's commercial partner, and not petitioner, who insisted on marketing a higher quality horse. Dr. Buell, as past chairman of petitioner's sales committee, testified that it was not entirely in petitioner's interest to sell the best, that it was petitioner's commercial partner who argued that it was "a waste of time to conduct sales to *389 sell a lot of cheap horses." Respondent notes that Mr. Johnson, a member of petitioner's board of directors and past president, testified that he was in the business of selling thoroughbred horses. He sold his best horses privately and got rid of his otherwise nonsellable crop at petitioner's auction sales. Additionally, the evidence establishes that the auction sales were carried on solely for the convenience of and as a commercial service for its members and nonmembers. Mr. Roberts, one of petitioner's members and a member of its board of directors, testified, "The most important thing that the CTBA has, in fact, done for me, one individual in this industry, is to provide a sales outlet for my product that is dependable, that has integrity, that optimizes the value of my product * * *." Dr. Buell, a member of petitioner's board of directors and past chairman of petitioner's sales committee, testified that "if [the horses] don't measure up to standard you get rid of them. You have to sell them. And I have always chosen public auction * * * as a way to buy horses I want to buy, and * * * [sell] horses. * * * So buying and selling * * * your breeding stock is certainly * * * *390 the way at which you aspire to improve the quality of your product." Thus, respondent contends the auction sales do not primarily assist the California thoroughbred breeders as a whole to improve and promote the breed but benefit the individual members to get rid of the horses which do not measure up to standard. Respondent concludes therefore there is no merit in petitioner's position that its commercial services are not subject to tax on unrelated business taxable income. Along these lines, respondent points out that CTBA Sales: (a) hoped to become a "solid rock outlet" for the sale of horses in California. (b) hoped to build and lease a necessary sales pavilion to operate its sales activity. (c) actively looked for another site to construct a more adequate sales facility (home) to conduct its sales. (d) promoted its sales out of state upon the fear that its sales activity might "die on the vine" or allow competitors to enter the sales market. (e) allowed members to get rid of their lesser quality thoroughbreds. (f) considered itself as more of a corporation than a breeder's society. (g) guaranteed and ensured that the consignor (seller) received the purchase price *391 in the event the purchaser defaulted. (h) ensured that the outside sales companies didn't come in and skim off the best available horses. (i) concluded that it was big enough "to fly by ourselves now," without their commercial nonexempt joint venturer, the Fasig-Tipton Company. (j) formed a wholly owned taxable corporation to attract venture capital with which to continue its sales activities. (k) acted as a commercial outlet for the sale and dispersal of horses for estates and divorce proceedings. Contrary to respondent's assertions, petitioner in these cases has shown that the auction sales conducted by petitioner are indeed suited to the accomplishment of its objectives of encouraging, assisting, regulating, and protecting the breeding of thoroughbreds in the State of California. The size of the state, the scattering of breeders throughout the state, the history of unreliable auction sales conducted by private commercial operations, the inherent importance of petitioner's auctions to the operations of the industry, and the benefits achieved by the industry because of the auctions all establish that the auction sales were indeed substantially related to CTBA's objectives. *392 Section 1.501(c)(5)-1(a)(2), Income Tax Regs., states that the betterment of the conditions of those engaged in such pursuits, as well as the improvement of their products, are the exempt purposes of a section 501(c)(5) organization. Here, petitioner's activities were not dominated by its sales operations, and the sales operations were not conducted on a scale that far exceeded that which might have been appropriate to furthering the organization's exempt purposes. Sec. 1.513-2(a)(4), Income Tax Regs. In fact, for many years the auction sales earned no profit. The thoroughbred industry is very specialized, and the product it produces is generally quite expensive. Petitioner itself was not buying and selling the product but providing the outlet for its members to do so. Of particular significance is that the industry had no comparable commercial outlet available for such services. Had petitioner not organized such sales, the industry as a whole would undoubtedly have floundered, with the result that the California horses would have remained undermarketed and underpriced. Respondent would have us believe that petitioner did not encourage the improvement of the product by offering *393 for sale only the best thoroughbreds. However, one of the goals of an agricultural organization is also the betterment of the conditions of those engaged in such pursuits. By offering all thoroughbreds for sale, petitioner allowed many to enter the market who otherwise might be prohibited because of the very high price of the "best" thoroughbreds, which in turn served the California industry. Moreover, horses perceived as mediocre by California standards are often sold out of state where they are more than adequate for those racing circuits. Not every horse is of Kentucky Derby quality. All horses sold at auction were "registered" and not of questionable background. In any case, by selling less than the "best" as well, petitioner's actions show that profit was not the only motive for the auctions. The conduct of petitioner leads us to conclude that petitioner's predominant intent was not to turn a large profit but was to further its exempt purpose by providing a valuable adjunct service which helped the California thoroughbred industry and, thus, the thoroughbred product in the State of California. See United States v. American College of Physicians, 475 U.S. 834 (1986). *394 In-state members' purchases of out-of-state horses provided new bloodlines to the California breeder. Out-of-state purchases of the California thoroughbreds helped promotion of the product and perhaps an increase in the value of the horses. The fact is that without CTBA Sales involvement, there may have been no market for the members at all and, thus, no encouragement, assistance, regulation, or protection of the industry. Based on the facts and circumstances, we find that petitioner's auction activity was substantially related to petitioner's exempt purposes. We therefore need not consider the alternative issue. Decisions will be entered for the petitioner. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Section 501(c)(3) exempts from taxation entities "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary or education purposes * * *."↩
3. Rev. Rul. 69-51, 1969-1 C.B. 159 dealt with a section 501(c)(5) cattle association which, as a service to customers, sold for a commission member's cattle. Respondent held that the sales neither promoted nor improved the breed generally but were carried on for the convenience of members and had no causal relationship to the association's exempt purpose. The revenue ruling provided little, if any, factual background on the sales, and without further development of the facts, we have no way to analogize this ruling. Furthermore, it appears to adopt a "per se" rule that any sale or auction of member's products is unrelated income. We will not adopt such a rule. Moreover, we note that revenue rulings represent the Commissioner's position and do not, therefore, ordinarily constitute authority in this Court. Tandy Corp. v. Commissioner,↩ 92 T.C. (May 31, 1989).